UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
HARTFORD FIRE INSURANCE COMPANY as
subrogee of PROFESSIONAL PRODUCTS
RESEARCH CO., INC.,                                    **MEMORANDUM AND ORDER**
                                                        09-CV-4127 (RRM)(ALC)
                    Plaintiff,

        - against -

ATLANTIC HANDLING SYSTEMS, LLC,

                    Defendant.
------------------------------------------------------------X
ATLANTIC HANDLING SYSTEMS, LLC,

                    Third-Party Plaintiff,

        - against -

DENIS BRAVO and NELSON CAZARD doing
business as LATIN INSTALLATIONS,

                    Third-Party Defendants.
------------------------------------------------------------X
**ROSLYNN. R. MAUSKOPF, United States District Judge.**

        Plaintiff Hartford Fire Insurance Company ("Hartford"), as subrogee of Professional

Products Research Co., Inc. ("PPRC"), brings this action against Atlantic Handling Systems,

LLC ("Atlantic"), seeking damages for Atlantic's alleged negligence in causing a fire in a

building owned by PPRC.  (Compl. (Doc. No. 1) ¶¶ 3–4.)  Atlantic impleaded Latin Installations

("Latin") as a third-party defendant, alleging that any harm to PPRC was solely due to the

conduct of Latin.  (Third Party Compl. (Doc. No. 10) ¶¶ 6, 8–10.)  Hartford also seeks damages

from Latin, alleging that Latin violated a duty to PPRC under the same negligence theories

brought against Atlantic. (*See* Pl.'s Claims Against Third Party Defs. ("Pl.'s Third Party

Compl.") (Doc. No. 15) ¶¶ 28–35.)

On January 28 2011, Latin and Hartford moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*See* Atlantic's Mot. Summ. J. (Doc. No. 30) at 1; Latin's Mot. Summ. J. (Doc. No. 34) at 1.) Although the motions are separate, each is based on the same claim: that neither party owed a duty to PPRC. For the reasons set forth below, both motions for summary judgment are GRANTED.

## BACKGROUND[1]

The facts are either undisputed or set forth in the light most favorable to plaintiff. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2001). Plaintiff is an insurance company, based in Connecticut, that pursuant to its insurance policy with PPRC is subrogated to all of PPRC's rights in this case. (Compl. ¶ 9.) Atlantic is a vendor of industrial storage systems, based in New Jersey. (*See* Atlantic's Statement Pursuant to Local R. 56.1 (Doc. No. 30) ("Def.'s 56.1 Stmt.") ¶¶ 7–8.) PPRC is a vendor of foot care products. (Atlantic's Mot. Summ. J. Ex. I (Jefairjian Dep.) (Doc. No. 30-10), at 6.)

At all relevant times PPRC owned a building at 73 20th Street in Brooklyn, New York, where it did business as Pro-Foot, Inc. (Def.'s 56.1 Stmt. ¶¶ 1–3.) In or about August 2008, a PPRC representative invited Atlantic to submit a bid for the sale and installation of a "push-

---

[1] The following facts are drawn from Atlantic's Local Rule 56.1 statement, and declarations, affidavits, and exhibits submitted in support of and opposition to defendants' motions for summary judgment. Unless otherwise noted, citations to the Rule 56.1 statement concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). Plaintiff did not include a Rule 56.1 statement in opposition to defendants' motions for summary judgment. Ordinarily, failure to comply with the Local Rules regarding 56.1 Statements would result in the material facts in the moving party's Statement being deemed admitted for the purposes of deciding the pending summary judgment motion. *See* Local Civil Rule 56.1(c). A district court, however, "has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Rateau v. City of N.Y.*, No. 06–CV–4751(KAM)(CLP), 2009 WL 3148765, at *1 (E.D.N.Y. Sept. 29, 2009) (exercising discretion in reviewing the admissible record evidence in determining whether proposed undisputed facts were disputed); *Robinson v. Keyspan*, No. 03–CV–4796(FB)(LB), 2005 WL 3006687 (E.D.N.Y. Nov. 9, 2005) (same). Accordingly, for the purposes of this motion, defendants' statements of undisputed facts are treated as undisputed only where they are not controverted by admissible evidence in the record.

back" rack system in the PPRC building. (*See id.* ¶ 8.) A "push-back" rack is a storage system where pallets of merchandise are loaded onto sliding rails that push back into the bays of the shelving unit. (*See* Pl.'s Mem. in Opp'n to Defs' Mot. for Summ. J. (Doc. No. 33-2) ("Pl.'s Mem.") at 2.) PPRC provided Atlantic with specifications drafted by a previous contractor that showed the configuration of the rack system, as well as the location where PPRC wanted it installed. (*See* Def.'s 56.1 Stmt. ¶ 8–9; Atlantic's Mot. Summ. J. Ex. G ("Rack Specifications, Invoice and Purchase Order") (Doc. No. 30-8), at 13.) PPRC's proposed rack system was six bays wide, with each bay holding two rows of merchandise, by three levels high; the unit as called for in the specifications was approximately fifty-six feet across by fifteen feet tall. (Rack Specifications, Invoice and Purchase Order at 13.)

John Cosgrove, the president of Atlantic who also happened to be a volunteer firefighter, visited the site before submitting a bid. (Def.'s 56.1 Stmt. ¶ 11.) While at the site, Richard Jefairjian, an employee of PPRC, showed Cosgrove the location where the shelving unit was to be installed. (Jefairjian Dep. at 19.) The shelving unit was to be built against a wall, which would block a steel door with a roll-up canister above it. (Rack Specifications, Invoice and Purchase Order at 13.) Cosgrove was aware that the rack would likely be used to store corrugated cardboard. (*See* Atlantic's Mot. Summ. J. Ex. H (Cosgrove Dep.) (Doc. No. 30-9) at 21.) A typical pallet of cardboard stored by PPRC was 4.5 feet tall. (*See* Pl.'s Mem. at 2.) The exact height of the ceiling is not in the record, but, according to a measurement taken by Cosgrove, the distance between the floor and a heater that hung from the ceiling in the middle of the room was twenty feet. (*See* Cosgrove Dep. at 25.) Cosgrove also looked for obstructions, noting the existence of sprinkler heads on the ceiling. (*See id.* at 23.) He also noted that because of the protruding roll-up canister above the blocked door, the rack would need to be built twenty

inches out from the wall. (*See id.* at 26.) Cosgrove did not notice the radiant gas-powered heater located above the canister on the wall, nor did he specifically look for heaters. (*See id*. at 27, 31.) Although the heater was above the canister, the record does not reflect the exact height of the heater from the ground or racking system.

Atlantic's bids included the price of material and installation. (Rack Specifications, Invoice and Purchase Order at 3.) In or about September 2008, PPRC accepted Atlantic's bid. (Def.'s 56.1 Stmt. ¶ 13.) Atlantic hired New Jersey residents Denis Bravo and Nelson Cazard, doing business as Latin Installations, to install the rack system, which was done in November 2008. (*Id.* ¶¶ 15, 16.) During the installation, Cosgrove made a second visit to the site, during which time he neither noticed, nor looked for heaters near the installation area. (Cosgrove Dep. at 64.) When the installation of the racking system was nearly complete, Jefairjian noticed the heater above the door canister. (*See* Jefairjian Dep. at 26; Pl.'s Mem. at 10.) He then told an unnamed installer, working for Latin, to turn off the gas valve leading to the heater; since Jefairjian believed the installers only spoke Spanish, he also told another employee, Yubenrrys Mateo ("Mateo"), who also spoke Spanish, to relay the message. (*See* Jefairjian Dep. at 26–27; Atlantic's Mot. Summ. J. Ex. J (Mateo Dep.) (Doc. No. 30-11) at 12.) Jefairjian also instructed Mateo to turn off the thermostat leading to the heater, which Mateo claims to have done. (*See* Mateo Dep. at 34–36.) Both Jefairjian and Mateo believed that an employee for Latin turned off the gas valve, though neither of them checked to make sure the gas was in fact turned off. (Jefairjian Dep. at 29; Mateo Dep. at 34.)

In mid-November 2008, after Latin completed installation, Jefairjian inspected the racking system. (Def.'s 56.1 Stmt. ¶ 20–21; Jefairjian Dep. at 31.) Neither Jefairjian, nor any other PPRC representative, notified Atlantic that they believed the racking system contained any

defects. (Def.'s 56.1 Stmt. ¶ 24.) PPRC stacked pallets of corrugated cardboard on the racking

system for the period between mid-November 2008 and February 2, 2009. (*Id.* ¶ 22; Mateo Dep.

at 37.) On February 2, 2009, a fire occurred in the PPRC building. (Def.'s 56.1 Stmt. ¶ 25.)

The New York Fire Department ("NYFD") determined that the fire was caused by the proximity

of the cardboard that PPRC had stacked to the radiant heater located above the rack. (*Id.* ¶ 27;

Atlantic's Mot. Summ. J. Ex. K (Doc. No. 30-12) (NYFD Incident Report), at 2.) No party

stated how the heater turned on, nor could any party definitively state that the heater had been

turned off by Latin. John Orlando, a NYFD fire marshal assigned to investigate the fire,

estimated that corrugated cardboard was stacked within one to three feet of the heater at the time

of the fire. (Atlantic's Mot. Summ. J. Ex. L (Orlando Dep.) (Doc. No. 30-13) at 29.) Plaintiff

claims that corrugated cardboard was stacked within eighteen inches of the heater. (*See* Pl.'s

Mem. at 9.)[2]

Hartford, PPRC's first party property insurer, paid PPRC $484,393.25 in connection with

the loss sustained as a result of the fire on February 2, 2009. (Compl. ¶¶ 2–3.) As a result of

paying PPRC's insurance claim, Hartford was subrogated to PPRC's right to bring a cause of

action arising out of the fire. (*Id.* ¶ 8.) On September 25, 2009, Hartford brought a claim against

Atlantic, alleging negligence in the installation of the rack system, and seeking damages for the

amount paid to PPRC. (*See id.* ¶¶ 15–19, 21.) As the parties are completely diverse, and the

amount in controversy is over $75,000, the court has subject matter jurisdiction under 28 U.S.C.

§ 1332. *See also Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 363 (2d Cir. 2000.)

On February 10, 2010, Atlantic filed a third-party complaint, alleging that PPRC's injury

and Atlantic's liability, if any, resulted solely from Latin's breach of duty to PPRC. (Third

---

[2] Plaintiff cites Mateo's deposition for this proposition. However, it is unclear if the "foot and a half" that Mateo described is the distance between the heater and the cardboard, or the distance between the heater and the wall. (Mateo Dep., at 39).

Party. Compl. ¶¶ 6, 8–10.) On May 11, 2010, Hartford brought a claim against Latin under Federal Rule of Civil Procedure 14(a)(3), alleging that Latin violated a duty to PPRC under the same negligence theories brought against Atlantic. (*See* Pl.'s Third Party Compl.; *see also Int'l Paving Sys., Inc. v. Van-Tulco, Inc.*, 866 F. Supp. 683, 686–87 (E.D.N.Y. 1994).)[3] On January 28, 2011, Atlantic and Latin filed motions for summary judgment, claiming that neither owed a duty of care to PPRC.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the nonmoving party. *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). The court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d

---

[3] A plaintiff may bring a claim against a third-party defendant when the claim arises "out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff." Fed. R. Civ. P. 14(a)(3). Furthermore, to prevent "undue complicat[ion]" and collusion among the parties, there must be an independent basis for federal jurisdiction over any claim a plaintiff seeks to assert against a third-party defendant. 6 Charles Alan Wright et al., Federal Practice and Procedure § 1459 (3d ed. 2011). Here, as Hartford brought the same claim against Latin that it asserted against Atlantic, and Hartford and Latin have diversity of citizenship, the requirements for bringing a claim against Latin as third-party defendant are satisfied.

845, 854 (2d Cir. 1996)).  Any evidence in the record of any material fact from which an

inference could be drawn in favor of the non-moving party precludes summary judgment.  *See*

*Castle Rock Entm't*, 150 F.3d at 137.

Once the movant has demonstrated that no genuine issue of material fact exists, then "the

nonmoving party must come forward with 'specific facts showing that there is a genuine issue

for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(quoting Fed. R. Civ. P. 56(e)) (emphasis in original).  However, there must exist more than

mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion.  *Id.* at

586. Instead, the non-moving party must present "concrete evidence from which a reasonable

juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256. Only disputes over material

facts "that might affect the outcome of the suit under the governing law" will properly preclude

the entry of summary judgment.  *Id.* at 248; *see also Matsushita*, 475 U.S. at 586.

### DISCUSSION

Hartford's claims are based solely on theories of negligence.  A plaintiff seeking to

establish a prima facie case of negligence under New York law[4] must demonstrate the following:

"1) the existence of a duty flowing from defendant to plaintiff; 2) a breach of this duty; 3) a

reasonably close causal connection between the contact and the resulting injury; and 4) actual

loss, harm or damage."  *Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 299

(2d Cir. 1996) (citing *Febesh v. Elcejay Inn Corp.*, 555 N.Y.S.2d 46, 47 (App. Div. 1st Dep't

1990)).  Although the plaintiff is responsible for establishing each of these elements, " '[t]he

---

[4] New York law governs this tort action because "a federal court sitting in diversity applies the law of the forum
state and because New York is the state where the tort [allegedly] occurred." *Velez v. Sebco Laundry Sys., Inc.*, 178
F. Supp. 2d 336, 339 (S.D.N.Y. 2001); *see Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996). Also, since the parties'
memoranda assume New York law and New York City regulations control the issues presented, their implied
consent is sufficient to establish choice of law.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004);
*Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

threshold question in any negligence action is:  does defendant owe a legally recognized duty of care to plaintiff?' "  *Merrick Gables Ass'n, Inc. v. Town of Hempstead*, 691 F. Supp. 2d 355, 364 (E.D.N.Y. 2010) (quoting *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001)). "Absent a duty of care, there can be no breach thereof and no liability."  *Gray v. Wackenhut Servs., Inc.*, 721 F. Supp. 2d 282, 287 (S.D.N.Y. 2010).  Whether a duty exists in any given case is a question of law for the Court.  *See Crum & Forster Specialty Co. v. Safety Fire Sprinkler Corp.*, 405 F. Supp. 2d 223, 227 (E.D.N.Y. 2005) (citing *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 (1994)).

New York generally does not recognize a cause of action for negligent performance of a contract.  *See Med. Research Assocs., P.C. v. Medcon Fin. Servs., Inc*., 253 F. Supp. 2d 643, 649 (S.D.N.Y. 2003); *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 644 (E.D.N.Y. 2000).  As between a contractor and the hiring party the " 'legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.' "  *Ross v. FSG PrivatAir, Inc.*, No. 03-CV-7292(NRB), 2004 WL 1837366, at *7 (S.D.N.Y. Aug. 17, 2004) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987); *see also Trump Int'l Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302 (S.D.N.Y. 1996) ("Given the absence of any legal duty independent of the [contract, plaintiff] cannot unilaterally transform its action for breach of warranty and/or contract into a tort claim for negligence.").

Here, plaintiff makes the same negligence argument against both Atlantic and Latin:  that as a result of the sale and installation contract, both Atlantic and Latin owed PPRC an

independent common law duty of care to install the rack shelving without negligence.[5]  (*See* Compl. ¶ 16; Pl.'s Third Party Compl. ¶ 28).  Plaintiff also argues Atlantic and Latin owed PPRC a duty arising out of the New York City Administrative Code ("Administrative Code"). (*See* Compl. ¶ 21; Pl.'s Third Party Compl. ¶ 33).  Each claim will be addressed in turn.

## I.      Common law duty of reasonable care

Plaintiff asserts that Atlantic and Latin owed PPRC a duty of reasonable care to ensure that PPRC would not stack flammable objects in dangerous proximity to heating units.  (*See* Compl. ¶ 16).[6]  In some circumstances, New York courts have found that a contractor owes a common law tort duty to perform a contract non-negligently.  *See, e.g., Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8 (2d Cir. 2000) (engineers owed professional duty to complete work with reasonable care); *Anunziatta v. Orkin Exterminating Co.*, 180 F. Supp. 2d 353, 359 (N.D.N.Y. 2001) (exterminator's negligent performance of contract led to substantial termite damage); *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 552–53 (1992) (fire alarm company could be liable in tort for conduct leading to delay in fire department response to fire); *Syracuse Cablesystems, Inc. v. Niagara Mohawk Power Co.*, 578 N.Y.S.2d 770, 772–73 (App. Div. 4th Dep't 1991) (negligent operation of power transformer led to explosion and PCB contamination).

---

[5] The contractual duties of Latin and Atlantic were identical, all parties were aware that the installation was for PPRC's benefit, and PPRC was actively involved in the installation of the shelving. (Def.'s 56.1 Stmt. ¶¶ 16–24.) Therefore, the relationship between Latin and PPRC was the "functional equivalent" of privity, and the Court's analysis with respect to the existence of an independent duty to PPRC applies with equal force to Atlantic, as contractor, and Latin, as subcontractor. *See RLI Ins. Co. v. King Sha Grp., Inc.*, 598 F. Supp. 2d 438, 444 (S.D.N.Y. 2009) (citing cases and finding "functional equivalent of privity" between owner and subcontractor sufficient to trigger analysis of independent tort duty between owner and subcontractor); *City Sch. Dist. v. Hugh Stubbins & Assocs., Inc.*, 85 N.Y.2d 535, 538–39 (1995); Pl.'s Mem., at 22 (contending that the duties Latin owed PPRC were coextensive with the duties owed by Atlantic).

[6] In its complaint, plaintiff also argues that Atlantic had a duty to supply barriers which would have prevented PPRC from stacking boxes near the heater.  (*See* Compl. ¶ 16.)  Atlantic's summary judgment memorandum addresses this claim, but Hartford failed to respond.  (See Def.'s Mem. in Supp. (Doc. No. 31), at 9.)  Therefore, plaintiff's specific claim regarding the heat barriers is deemed abandoned.  *See Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010).  However, as explained below, the claim would fail on the merits, as the defendants did not owe a wider common law duty to prevent the fire.

However, this duty only applies to the "limited class of cases in which a strong public interest in the careful performance of particular contractual obligations may give rise to a tort duty of due care." *Pfizer, Inc. v. Stryker Corp.*, No. 02-CV-8613(LAK), 2003 WL 21660339, at *2 (S.D.N.Y. July 15, 2003) (citing *Sommer*, 79 N.Y.2d at 540.); *see also Vigilant Ins. Co. v. ADT Sec. Servs., Inc.*, No. 10-CV-3066(BSJ), 2011 WL 855874, at *3 (S.D.N.Y. Mar. 9, 2011) (holding that alarm company did not owe a duty of care apart from contract because, unlike the fire alarm company in *Sommer*, ADT was not "franchised and regulated" by New York City).

In *Hydro Investors*, the Second Circuit described the factors which led the New York Court of Appeals to find a tort duty in *Sommer*:

> (1) that the fire alarm company's duty of care derived not only from contract but from the nature of its services; (2) that the fire alarm stations are franchised and regulated by the City; (3) that the fire alarm company served a significant public interest; (4) that the breach of the fire alarm company's duties could have catastrophic consequences; (5) the nature of the fire alarm company's relationship with the skyscraper owner; and (6) the sudden manner of the loss.

227 F.3d at 17 (citing *Sommer*, 79 N.Y.2d at 552–53). Each factor is discussed in turn.

## A. Nature of the services and relationship

Courts typically uphold claims for negligent performance of a contract when the parties stand in a professional or fiduciary relationship, and the plaintiff relied on the defendant to supply a specialized service. *See, e.g.*, *Hydro Investors*, 227 F.3d at 17–18 (2d Cir. 2000) (duty independent of contract between plaintiff and professional engineer); *Green Hills (USA), L.L.C. v. Aaron Streit, Inc.*, 361 F. Supp. 2d 81, 89–90 (E.D.N.Y. 2005) (duty independent of contract between plaintiff and environmental consultant); *see also TD Waterhouse Investor Servs., Inc. v. Integrated Fund Servs., Inc.*, No. 01-CV-8986, 2003 WL 42013, at *13 (S.D.N.Y. Jan. 6, 2003) (no duty where accounting services were provided but there was no fiduciary relationship); *Am. Tel. & Tel. Co. v. N.Y.C. Human Res. Admin.*, 833 F. Supp. 962, 984 (S.D.N.Y. 1993) (noting

that "courts have found that professionals rendering services pursuant to a contract have a 'duty of due care' independent of the contract when providing a professional service," but the contract at issue for sale and installation of a telecommunications network did not give rise to such an independent duty). In *Anunziatta* and *Sommer*, the failure to exercise due care under specialized service contracts gave rise to tort claims akin to professional malpractice, where negligent performance would foreseeably lead to substantial damages. *See Anunziatta*, 180 F. Supp. 2d at 358 ("[Termite extermination company] held itself out to be a reliable professional, capable of performing the job in a careful, professional manner. Thus, [it] was obliged to use reasonable care, as it was clear Plaintiffs were relying on [it] to complete the treatment of their home with due care."); *Sommer*, 79 N.Y.2d at 552–53 ("[F]ailure to perform the [fire alarm relay] service carefully and competently can have catastrophic consequences."). Where the service is provided primarily for the safety of the contracting party, or contemplates an ongoing relationship to address a recurring problem, the contractor may have a duty of reasonable care to prevent property or personal injury. *See, e.g.*, *id.* at 79 N.Y.2d at 550 (finding that defendant's contractual obligation to provide a fire alarm relay system gave rise to an independent tort duty of care because, *inter alia*, "grossly negligent fire alarm service threatens life and property"); *Anunziatta*, 180 F. Supp. 2d at 357–58 (ongoing ten-year relationship between termite exterminator and homeowners gave rise to a tort duty independent of contract).

In contrast, the nature of Atlantic's contract with PPRC was not one where the contractor's service was performed primarily for safety, or to remedy an ongoing problem, which if not performed with due care, would lead to further damage. Atlantic and Latin's responsibility was to supply and install over the course of three days a racking system designed pursuant to PPRC's specifications – not to provide continuing service calls or other maintenance, oversee the

use of the equipment, modify the existing factory space, or protect against the risk of fire.  (*See* Cosgrove Dep. at 64; Atlantic's Mot. Summ. J. Ex. M (Bravo Dep.) (Doc. No. 30-14), at 30.) The services with which Atlantic and Latin were tasked, and the resulting relationship with PPRC, were thus distinct from the professional, reliance-based contracts that give rise to an independent duty.  *Cf. Anuziatta*, 180 F. Supp. 2d at 358; *Am. Tel. & Tel. Co.*, 833 F. Supp. at 985 (S.D.N.Y. 1993) ("[I]nstallation [of a telecommunications network] does not amount to the provision of professional services such that a 'duty of due care' [is] created independent of the contract."); *T.P.K. Constr. Corp. v. S. Am. Ins. Co.*, 752 F. Supp. 105, 110 (S.D.N.Y. 1990) (granting summary judgment for defendant on negligence claim where parties had an arm's length contract, noting that defendant "cannot be held to a higher standard of conduct than that required under the [contract] unless plaintiff presents evidence of an independent duty of the defendant to plaintiff."); *Niagara Mohawk Power Corp v. Stone & Webster Eng'g Corp.*, 725 F. Supp. 656, 666, 669 (N.D.N.Y. 1989) (denying dismissal of power plant owner's tort claims against construction contractor where owner alleged that a five-year relationship of "trust and confidence" had arisen in connection with the contractor's provision of services, while noting also that "[t]he mere fact that the alleged breach involved a contract that encompassed the performance of services does not suffice" to establish an independent tort duty); *Sommer*, 79 N.Y.2d at 552–53.

Plaintiff contends that Cosgrove's experience as a volunteer firefighter suffices to create the kind of professional relationship between Atlantic and PPRC that may give rise to an affirmative duty independent of the contract to prevent fires such as the one that occurred here. (*See* Pl.'s Mem. at 15–17.)  Plaintiff relies on *Stanford v. Kuwait Airways Corp.*, where the defendant airline allowed terrorists to board its planes in Beirut, after which the terrorists

connected in Dubai to a flight of another airline, and subsequently harmed third-party Dubai passenger-plaintiffs. 89 F.3d 117, 120–21 (2d Cir. 1996). The Second Circuit held the defendant airline to a duty to protect the third party passengers, noting the role of "the particular level of knowledge of the alleged tortfeasor" in finding a duty. *Id.* at 123.

*Stanford* offers scant support for plaintiff's position. First, it is inapposite: the defendant airline there did not stand in any contractual relationship whatsoever with the injured third-party passengers, and tort duty independent of contract was not at issue. *Stanford*, 89 F.3d at 123 (plaintiffs lacked privity with defendant). Second, the Circuit repeatedly noted the airline's unique position in controlling those who board its planes, in the first instance, to protect the safety of passengers aboard connecting flights, given the interconnected nature of airline travel – factors directly implicating reliance and safety wholly absent in the relationship between PPRC and Atlantic in the instant case. *See id.* at 123–25. The record reveals that PPRC did not put its safety into the hands of Cosgrove because, although Cosgrove visited the site, he did so only to make sure the racking system would fit in the space where PPRC wanted it to go, and he was not asked to look for fire hazards. (*See* Cosgrove Dep. at 35–36; Jefairjian Dep. at 19.) In fact, it was PPRC that was aware of the existence of the heater, and that took steps to render it inoperable. (Jefairjian Dep. at 26–27; Mateo Dep. at 12.) The nature of the services that Atlantic and Latin provided, and their relationship with PPRC, therefore, weigh against finding an independent tort duty here.[7]

---

[7] Plaintiff's reliance on *Allstate Ins. Co. ex rel. Lothridge v. Gonyo*, No. 08-CV-1011(RFT), 2009 WL 962698 (N.D.N.Y. Apr. 8, 2009) is equally misplaced. There, a tenant lit a wood stove in a cabin, left to scout for deer, and returned to find the cabin burning down. *Id.* at *1. The court held that the tenant "had a duty as any other occupier of property to exercise reasonable care under the circumstances and that duty may include being aware of the surroundings and not creating a hazard." *Id.* at *5. The court noted that the tenant, a volunteer firefighter, acknowledged in his deposition the reasonableness of removing combustibles from the proximity of the wood stove. *Id.* at *5–6. Thus, the court held merely that a tenant's duty of reasonable care includes the duty to remove combustibles in close proximity to a burning wood stove; not, as plaintiff maintains, that volunteer firefighters, as a matter of law, have an enhanced duty to remove combustibles under all circumstances.

### B. Franchised and regulated

In *Sommer*, the defendant alarm company was "franchised and regulated" by the city to oversee the alarm system of a forty-two-story building and report to the fire department, as part of the City's "comprehensive scheme of fire-safety regulations requir[ing] certain buildings – including [plaintiff]'s – to have central station fire service." 79 N.Y.2d at 552–53. Atlantic and Latin are not entities franchised by the city to perform installation contracts (or other services), PPRC was not required by regulation to build shelving in its warehouse, and no comprehensive scheme of regulations governs the installation of shelving. (*See* Def.'s 56.1 Stmt. ¶¶ 10–12, 20–21; Jefarjian Dep. (Doc. No. 30-10) at 26.) Atlantic and Latin sold and installed the rack to PPRC solely as a result of their private dealings with each other, not because law or regulation required it. (*See* Rack Specifications, Invoice and Purchase Order.) Therefore, this factor also counsels against the finding of a tort duty independent of the contract between the parties. *See Vigilant*, 2011 WL 855874, at *3 ("[Insurer] did not plead that [homeowner] was required by code or regulation to have his fire alarm monitored or that ADT had a special relationship with a city or country whereby ADT was required to report to the fire department. ADT's obligation to install, monitor, maintain, and test the alarm system arose only under the Contract. Simply put, ADT did not owe [homeowner] an independent duty to perform its contractual obligations with care and skill.").

### C. Public interest

Plaintiff does not suggest that the services provided by Atlantic and Latin's promoted a significant public interest. Neither the sale nor the installation of storage systems in a warehouse puts the safety of a significant segment of the population in the hands of the contracting party. Rather, "[w]hether and how well they function [were] purely private matters." *Vitolo v. Mentor H/S, Inc.*, 213 F. App'x 16, 18 (2d Cir. 2007) ("Unlike the central fire alarm monitoring services

provided by New York City fire alarm companies, which contribute to the response time of the New York City Fire Department, the breast implants produced by Mentor do not risk the same kind of devastating effect on the public as faulty monitoring of fire alarm systems." (citing *Sommer*, 79 N.Y.2d at 552–53)).  The services rendered here are easily distinguished from those implicating statutory or common law duties to protect the public from harm.  *Cf., e.g.*, 49 U.S.C. §§ 44701(d)(1)(A) ("The duty of an air carrier [is] to provide service with the highest possible degree of safety in the public interest."); *In re Sept. 11 Litig.*, 594 F. Supp. 2d 374 (S.D.N.Y. 2009) ("The air carrier's duty extends, beyond those aboard the aircraft to 'individuals and property on the ground.' " (quoting *Williams v. Trans World Airlines*, 509 F.2d 942, 946 (2d Cir. 1975))); *Ins. Co. of N. Am. v. Historic Cohoes II*, 879 F. Supp. 222, 227–28 (N.D.N.Y. 1995) (Chin, J.) (finding that the construction of over 100 federally-subsidized housing units for the elderly and the disabled was "affected with the public interest" as defined in *Sommer*); *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 315 (1995) (finding no independent tort duty beyond insurance contract for commercial crime policy because, *inter alia*, the public interest at stake in "governing the conduct of insurers and protecting the fiscal interests of insureds is simply not in the same league as the protection of the personal safety of citizens" at issue in *Sommer*); *Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 908 N.Y.S.2d 654, 656 (App. Div. 1st Dep't 2010) (defendant burglar alarm company had no independent tort duty beyond contract with bank because, *inter alia*, unlike the fire alarm company in *Sommer*, "no public interest [was] implicated" between the private contracting parties); *Trs. of Columbia Univ. v. Gwathmey Siegel & Assocs. Architects*, 601 N.Y.S.2d 116, 118 (App. Div. 1st Dep't 1993) (finding that faulty construction of student housing, which led to chunks of façade falling into public space, presents a pressing public safety concern, warranting the imposition of tort liability).  Therefore, sale and

installation of the racking system here did not serve a significant public interest, weighing against the finding of an independent tort duty.

### D.  Catastrophic consequences and sudden loss

Plaintiff argues that because it, like the plaintiff in *Sommer*, seeks recovery for damages resulting from an "abrupt, cataclysmic occurrence," defendants owe a tort duty independent of the contract.  *See Sommer*, 79 N.Y.2d at 553.  Plaintiffs, however, improperly treat as dispositive the sudden manner of the loss.  *See Hydro Investors*, 227 F.3d at 17 (noting the sudden manner of the loss as a "factor" in determining the existence of an independent duty); *Sommer*, 79 N.Y.2d at 552 (court "considered" the nature and manner of injury in determining existence of tort duty independent of contract).  Although an injury arising out of an "abrupt, cataclysmic occurrence" may weigh in favor of finding an independent duty, it is neither necessary, *see, e.g.*, *Anunziatta*, 180 F. Supp. 2d at 357, 359 (finding independent tort duty to prevent infestation occurring over ten year period); *Vill. of Groton v. Tokheim Corp.*, 608 N.Y.S.2d 565, 567 (App. Div. 3d Dep't 1994) (finding tort duty independent of contract despite the absence of any "abrupt, cataclysmic occurrence"), nor sufficient, *see, e.g.*, *Vigilant*, 2011 WL 855874, at *1–2 (fire alarm company had no independent tort duty despite sudden destruction of home by fire).[8] Therefore, the presence here of an abrupt loss is insufficient to outweigh the other factors, all of which counsel against the finding of a duty.

For the above reasons, the Court finds that, as a matter of law, defendants owed PPRC no independent duty to prevent fire.

---

[8] The Court notes, moreover, that the potentially catastrophic consequences of a failed non-flammable steel shelving system would include dangers associated with collapse or shoddy workmanship, not fire. *Cf., e.g.*, *Sommer*, 79 N.Y.2d at 552–53 (potentially catastrophic consequences of a failed fire alarm system – undetected fire – occurred in fact and gave rise to the abrupt loss); *Syracuse Cablesystems*, 578 N.Y.S.2d at 772–73 (potentially catastrophic consequences of a poorly maintained transformer – explosion and chemical contamination – occurred in fact and gave rise to the abrupt loss); *see generally Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 153 (S.D.N.Y. 2004) (collecting cases).

## II.     Duty supplied by the Administrative Code

Plaintiffs argue that various New York City Administrative Code provisions supply a duty independent of the contract where the Code specifically applies to require compliance with its provisions. *See RLI Ins. Co. v. King Sha Grp., Inc.*, 598 F. Supp. 2d 438, 445 (S.D.N.Y. 2009) (finding Administrative Code provision created specific duty independent of contract that excavator provide support for excavation under neighboring building); *see also Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Serv. Ctr.*, 02-CV-504(RCC), 2005 WL 550940, at *4 (S.D.N.Y. Mar. 9, 2005) (finding New York State Uniform Fire Prevention and Building Code and OSHA created duties independent of lease to store gasoline properly). However, like negligence *per se*, a regulation, such as the Administrative Code, applies only when the plaintiff is a member of the class which the regulation aims to protect, and the harm is of the type the regulation is intended to protect against. *See Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 292 n.37 (E.D.N.Y. 2005) (noting also that a showing of negligence *per se* as applied to regulations constitutes some evidence of negligence). As explained below, there is no evidence that the installation of the rack was governed by any provision of the Administrative Code cited by Plaintiff.

### A.  Building Code

Plaintiff cites a provision of the Building Code which provides clearance requirements for the installation of heaters. *See* N.Y.C. Admin. Code § 27-805. However, the cited provision applies to the installation of the heaters themselves, and their proximity to "combustible construction in walls, partitions, and ceilings." *Id*.; *see* N.Y.C. Admin. Code § 27-787 (entitled "Scope," providing that "This Subchapter [including § 27-805] shall establish the minimum safety requirements for, and control the *design, construction, installation, alteration and use of, heating, combustion, fuel storage and related equipment*.") (emphasis added). The plaintiff has

17

not presented, and the court has not found, any authority showing that this code provision applies to the installation of shelving – or, for that matter, any other ancillary sales or installation. *See, e.g.*, *Rivera v. Nelson Realty, LLC*, 7 N.Y.3d 530, 536–37 (2006) (related Code provision, § 27-809, requiring insulation of piping "carrying steam, water, or other fluids at temperatures exceeding one hundred sixty-five degrees Fahrenheit," did not apply to tenant's radiator); *Hughes ex rel. Kinsey v. Concourse Residence Corp.*, 878 N.Y.S.2d 333, 334 (App. Div. 1st Dep't 2009) (reversing dismissal of plaintiff's complaint alleging landlord's failure to insulate a pipe carrying hot steam or water, citing the provision at issue in *Rivera*); *In re 31171 Owners Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 599 N.Y.S.2d 19, 22 (App. Div. 1st Dep't 1993) (N.Y.C. Admin. Code § 27-787 *et seq.* govern whether "the boiler/burner [at issue] meets minimum standards of safety and is properly burning fuel, generating energy and providing heat."); *see also Infinity Outdoor, Inc. v. City of N.Y.*, 165 F. Supp. 2d 403, 411–13 (E.D.N.Y. 2001) (Building Code required plaintiff to acquire a permit prior to building a sign). As the sale and installation of the racking system here did not involve construction of heating equipment, combustion equipment or combustibles, Administrative Code § 27-805 is inapplicable.

### B. Fuel Gas Code

Plaintiff also contends that the Fuel Gas Code ("FGC") applies to create a duty here. The FGC is part of the New York City Construction Code. *See* N.Y.C. Admin. Code § 28-901.2 (incorporating FGC §§ 101 *et seq.*). Plaintiff cites FGC § 305.8, which reads: "Heat-producing equipment and appliances shall be installed to maintain the required clearances to combustible construction as specified in the [Code] and manufacturer's instructions." This provision, by its terms, applies to the installation of the heating units themselves, not unrelated construction. *Id.*; *see also* FGC § 101.2 ("[The FGC] shall apply to the installation of fuel-gas piping systems, fuel-gas utilization equipment and related accessories."). Even if, by way of inference, the Court

were to determine that the provision also applies to all combustible construction subsequent to the installation of the heaters, plaintiff does not claim that the steel racks themselves constitute combustible construction. *See Charter Oak Fire Ins. Co. v. Trio Realty Co.*, No. 99-CV-10827(LAP), 2002 WL 123506, at *5 & n.5 (S.D.N.Y. Jan. 31, 2002) (holding that tenant auto repair business' failure to maintain a gas-powered water heater in compliance with FGC was insufficient to show gross negligence by landlord); *Mlott v. Whirlpool Corp.*, 676 N.Y.S.2d 383, 384 (App. Div. 4th Dep't 1998) (holding that technician's failure to test manual gas shutoff valve as prescribed in FGC was a superseding cause of exploding dryer, absolving dryer's manufacturer of liability). Therefore, the FGC does not supply an independent duty to Defendants contractual responsibilities.

### C. Fire Code

Plaintiff also argues Atlantic and Latin violated the Fire Code ("FC") by failing to prevent PPRC from subsequently violating the "high-piled combustible storage" chapter of the FC. *See* N.Y.C. Admin. Code § 29-102 (incorporating FC §§ 101 *et seq.*); FC §§ 2301 *et seq.* FC § 2305.2 regulates the distance which must be maintained between an ignition source and "high-piled combustible storage" by way of reference to FC § 305, which provides: "Clearance between ignition sources, such as light fixtures, heaters and open-flame devices, and combustible materials shall be maintained in an approved manner." However, the clearance requirement in § 305 governs PPRC's behavior, as PPRC, the agent responsible for the actual storage, was in sole control of "maintaining" the distance between the combustible materials and the heaters, not Atlantic, which only supplied and installed a nonflammable shelving system months before the fire. (*See* Def.'s 56.1 Stmt. ¶ 30; Mateo Dep. at 37.) Indeed, plaintiff cites no cases in support of the proposition that the FC applies to a vendor such as defendant, and the Court is unable to find any. *See, e.g.*, *Boderick v. RY Mgmt. Co.*, 897 N.Y.S.2d 1, 4 (App. Div. 1st Dep't 2009) (noting

expert's opinion on safety of propane-powered deep fryer maintained by defendants building owner and manager, including compliance with the Fire Code); *Bean v. Ruppert Towers Hous. Co.*, 710 N.Y.S.2d 575, 578 (App. Div. 1st Dep't 2000) (noting opinions of fire investigator and plaintiff's expert concerning the safety of apartment door, including its compliance with the Fire Code, where the door was maintained by defendant building owner and manager).

In any event, the FC provisions to which plaintiff refers cannot supply a duty in this case because regulations setting forth duties in general terms, "enacted for the benefit of the general public, as opposed to the benefit of 'a particular group or class of persons,' do not create liability where there ordinarily would be none." *Sage Enters., Inc. v. Wells Fargo Alarm Servs., Inc.*, 1996 WL 1057144 (E.D.N.Y. 1996) (quoting *Schmidt v. Merchants Despatch Transp. Co.*, 270 N.Y. 287, 305, 200 N.E. 824 (1936)) (similar state fire code provisions enacted for general public benefit and cannot create duty in negligence action). The provision ultimately at issue here, FC § 305, is part of a chapter entitled "General Precautions against Fire," and is phrased in general terms, requiring only an "approved manner" of clearance. *See* FC § 202 (defining "approved" as "[a]cceptable to the commissioner"); *Bello v. Santiago*, No. 39445/2005, 2009 WL 1383603, at *21 & n.9 (Sup. Ct. N.Y. Cnty. May 18, 2009) (Code requirement that material used for containers be "acceptable to the commissioner" cannot support negligence action); *Spooner v. Nat'l Elevator Inspection Servs., Inc.*, 613 N.Y.S.2d 339, 341 (Sup. Ct. N.Y. Cnty. 1994) (requirement that elevator inspectors be "acceptable to the commissioner" synonymous with requirement that elevator inspector verify the general fitness of the elevator); *see also* Pl.'s Mem. at 19 (contending that an "approved manner" means general compliance with law and trade literature). Thus, FC § 305 is incapable of supplying a duty. *See, e.g.*, *Agate v. City of N.Y.*, No. 04-CV-5457(RRM), 2009 WL 3171799, at *6 (E.D.N.Y. Oct. 2, 2009) ("[O]nly where

the [labor] regulation in question contains a specific, positive command" can it give rise to liability; "where the regulation itself, using terms like adequate, effective, proper, safe, or suitable, merely incorporates the ordinary tort duty of care," it cannot. (internal quotation marks omitted) (quoting *Morris v. Pavarini Constr.*, 9 N.Y.3d 47, 50 (2007))); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 514 F. Supp. 2d 328, 336 (D. Conn. 2007) (characterizing the Connecticut statue at issue as "a broad administrative measure," and noting "the requirement that negligence *per se* actions be based on a clear statutory standard of behavior aimed at individuals," the court found "that the broad proscription [here] may not be used by individuals as a standard for negligence *per se* actions."); *German ex rel. German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995); *cf. Richards v. Pathmark Stores, Inc.*, No. 07-CV-1790(THK), 2008 WL 3165582, at *6 (S.D.N.Y. Aug. 6, 2008) (Code requirement that landowners keep sidewalk clear of snow and ice sufficiently specific to create duty); *RLI Ins. Co.*, 598 F. Supp. 2d at 444–45 (Code requirement that excavator provide support for excavation under neighboring building sufficiently specific).

In light of the foregoing, the Court finds that the Administrative Code provisions cited by plaintiff here are insufficient as a matter of law to give rise to a duty independent of the contract.

**CONCLUSION**

For the reasons stated in this Memorandum and Order, both motions for summary judgment  filed by defendant Atlantic and third-party defendant Latin (Doc. Nos. 30, 34) are GRANTED in their entirety.  The Clerk of Court is directed to enter judgment in favor of defendant Atlantic and third-party defendant Latin, and to close the case.


SO ORDERED.


Dated: Brooklyn, New York
      September 26, 2011

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge